UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ANGELICA LYNN ROBERTI,

**Plaintiff,**

    v.

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant**.

Case No. 1:19-cv-1399-TPK

OPINION AND ORDER

## OPINION AND ORDER

    Plaintiff Angelica Lynn Roberts filed this action under 42 U.S.C. §405(g) asking this Court to review a final decision of the Commissioner of Social Security. That final decision, issued by the Appeals Council on August 27, 2019, denied Ms. Roberts's's application for adult child's insurance benefits. Ms. Roberts has now moved for judgment on the pleadings (Doc. 9), and the Commissioner has filed a similar motion (Doc. 13). For the following reasons, the Court will **DENY** Plaintiff's motion, **GRANT** the Commissioner's motion, and direct the Clerk to enter judgment in favor of the defendant.

### I. BACKGROUND

    On April 7, 2016, Plaintiff filed her applications for benefits, alleging that she had been disabled since the date of her birth, May 6, 1998. At the time of the application, Plaintiff was seventeen years old. She had been receiving child's disability benefits previously, but those benefits ended on her eighteenth birthday.

    After initial administrative denials of her claim, Plaintiff appeared at an administrative hearing held on July 26, 2018. Plaintiff, her mother, and a vocational expert, Stephanie Archer, all testified at that hearing.

    The Administrative Law Judge issued an unfavorable decision on October 25, 2018. He concluded that Plaintiff she suffered from a single severe impairment, that being borderline intellectual capacity. He further determined that her impairment was not of the severity necessary to qualify for disability under the Listing of Impairments.

    Moving on to the next step of the inquiry, the ALJ found that Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels. However, she could perform only simple, routine, repetitive tasks in a work environment where change was minimal.

Additionally, she could not work along conveyor belts or assembly lines, nor could she do jobs needing mathematical computation or making change.

According to the testimony of the vocational expert, a person with Plaintiff's residual functional capacity could work as a marking clerk, which is a light, unskilled job, and as an unskilled cleaner at either the medium or light exertional levels. The expert also testified as to the numbers of such jobs which existed in the national economy. The ALJ accepted this testimony and therefore concluded that Plaintiff was not under a disability as defined in the Social Security Act.

Plaintiff, in her motion for judgment, asserts that the ALJ erred because his decision is "not supported by substantial evidence and is based on material errors and misapplication of the law..." Doc. 9, at 15. More specifically, she argues that she qualifies for benefits under Section 12.05 of the Listing of Impairments and asserts the ALJ improperly gave more weight to the opinion of a non-examining source, Dr. Bruno, than he did to Plaintiff's school psychologist, Ms. LaPointe. She also contends that the ALJ made multiple errors in determining her residual functional capacity.

## II. THE KEY EVIDENCE

Plaintiff was the first witness at the administrative hearing. She was twenty years old at the time and was still attending school in the morning, enrolled in special education classes. In the afternoon she worked at a learning program making sandwiches. She had held other such jobs as well involving food preparation and cleaning. She said she often needed to be reminded or corrected when she was working. Her mother reminded her daily to take her medication. Plaintiff also said that she was easily distracted and that she occasionally got migraine headaches which caused her to miss school once a week.

Tammy Pifer, Plaintiff's mother, testified next. She said Plaintiff was forgetful and needed to be reminded daily to shower or brush her teeth. Plaintiff also had trouble with measurements in recipes and was very poor in math. Ms. Pifer also confirmed Plaintiff's testimony about migraines and her attention deficits.

The final witness was Stephanie Archer, the vocational expert. She was asked questions about a person who could do simple, routine, repetitive tasks in a work environment with minimal changes and who could not work on conveyor belts or assembly lines. The person also could not climb ladders, ropes, or scaffolds, could not be exposed to unprotected heights, and could not drive a motor vehicle or operate dangerous machinery. He or she also could tolerate only occasional exposure to environmental irritants and could not be around bright flashing lights. In response, Ms. Archer identified jobs like marking clerk or cleaner that such a person could perform. Those jobs did not involve math computations or making change, but if the person needed to be reminded once or twice daily to stay on task, he or she could not be competitively employed. The same would be true of someone off task for more than 5% of the workday or someone missing more than one day of work per month.

The records pertinent to Plaintiff's claims of error show the following. Plaintiff's special education teacher completed a questionnaire on June 20, 2016, stating that Plaintiff had an obvious problem in the general area of acquiring and using information, with her most severe impairments being in the areas of understanding school content and vocabulary, comprehending and doing math problems, recalling and applying previously learned material, and applying problem-solving skills in class discussions. She also had issues in the realm of attending and completing tasks, with obvious problems in focusing on tasks, organizing materials, and working without mistakes, and a more serious problem with carrying out multi-step instructions. She needed assistance any time a new activity or lesson was introduced. Plaintiff did not, however, have any issues with moving about and manipulating objects or caring for herself. She did have some difficulty interacting with others, mostly in the context of conversations. (Tr. 229-36).

Other school records show that in 2014 Plaintiff achieved a score of 55 on the WJ-III, an intelligence test, which was consistent with prior test results, and that she had a short attention span consistent with her diagnosis of ADHD. When tested a few years later by the school psychologist, Ms. LaPointe (whose full report will be summarized below in connection with Plaintiff's second claim of error), Plaintiff scored 67 on the Wechsler Adult Intelligence Scale. Her lowest subtest score, 62, was on processing speed. Other later records show that she was engaged in vocational training and was meeting expectations in 14 out of 20 employment skills. She needed improvement in the areas of taking initiative, time on task, solving problems, observing critically, and solving math problems. Her long-term prospects included working "through supported employment in the food service or baking industries" and living "independently with supports." (Tr. 322).

A second teacher questionnaire was completed in June of 2018. At that time, Plaintiff was noted as having suffered from frequent migraine headaches causing her to miss school at least once per week. She had five obvious and five serious or very serious issues in the area of acquiring and using information and she also had serious problems in the areas of focusing and paying attention on an hourly basis and completing work without making careless mistakes. Plaintiff required "frequent redirection" and was "easily distracted." (Tr. 332). She also had a serious problem using good judgment to maintain her personal safety. A work-based learning evaluation from 2018 showed that by the end of the evaluation period Plaintiff needed improvement in her attendance, communication, and problem-solving skills but was meeting expectations in all other areas, a significant improvement from the prior year. (Tr. 341).

Plaintiff underwent an adult intelligence evaluation of July 6, 2016, performed by Dr. Ransom, a psychologist. At the evaluation, Plaintiff was cooperative and friendly and understood the instructions. Her full-scale IQ was measured at 77, with the lowest subtest score being 74 in working memory. Dr. Ransom diagnosed borderline intellectual capacity and low average adaptive functioning and thought that Plaintiff's prognosis was good. (Tr. 507-10).

Plaintiff's records were also evaluated by a state agency reviewer. In 2016, Dr. Bruno concluded that Plaintiff was moderately limited in the areas of maintaining attention and concentration for extended periods and maintaining attendance and being punctual as well as dealing with work stress. (Tr. 79-81).

### III.  STANDARD OF REVIEW

The Court of Appeals for the Second Circuit has stated that, in reviewing a final decision of the Commissioner of Social Security on a disability issue,

> "[i]t is not our function to determine de novo whether [a plaintiff] is disabled." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). Instead, "we conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir.2009); *see also* 42 U.S.C. § 405(a) (on judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").
>
> Substantial evidence is "more than a mere scintilla." *Moran*, 569 F.3d at 112 (quotation marks omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation marks omitted and emphasis added). But it is still a very deferential standard of review—even more so than the "clearly erroneous" standard. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999). The substantial evidence standard means once an ALJ finds facts, we can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir.1994) (emphasis added and quotation marks omitted); *see also Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir.1994) (using the same standard in the analogous immigration context).

*Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 447–48 (2d Cir. 2012)

### IV.  DISCUSSION

#### A.  The Listing of Impairments

Plaintiff's first argument is that she satisfies the criteria for disability set forth in section 12.05 of the Listing of Impairments. That section reads as follows:

**12.05 Intellectual disorder (see 12.00B4), satisfied by A or B**:

A. Satisfied by 1, 2, and 3 (see 12.00H):

1. Significantly subaverage general intellectual functioning evident in your cognitive inability to function at a level required to participate in standardized

testing of intellectual functioning; and

2. Significant deficits in adaptive functioning currently manifested by your dependence upon others for personal needs (for example, toileting, eating, dressing, or bathing); and

3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

OR

B. Satisfied by 1, 2, and 3 (see 12.00H):

1. Significantly subaverage general intellectual functioning evidenced by a or b:
a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or
b. A full scale (or comparable) IQ score of 71–75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and

2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:
a. Understand, remember, or apply information (see 12.00E1); or
b. Interact with others (see 12.00E2); or
c. Concentrate, persist, or maintain pace (see 12.00E3); or
d. Adapt or manage oneself (see 12.00E4); and

3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

Plaintiff reasons that she satisfies the requirement under section B(1)(a) because she obtained a score of 70 or below on an intelligence test - either the 55 she scored on the WJ-III or the 67 score from the WAIS-IV.  She then argues that she also satisfies the remaining criteria listed under section (B) because she has either an extreme or a marked limitation in her ability to understand, remember, or apply information, to concentrate, persist, or maintain pace, and to adapt and manage herself.  In contrast, the ALJ concluded that Plaintiff had only one marked limitation, that being in the area of understanding, remembering, and applying information.  In the other two areas at issue, the ALJ found that Plaintiff was only moderately limited.  His reasoning supporting those conclusions can be summarized in this way.

     First, as to Plaintiff's ability to concentrate, persist, or maintain pace, the ALJ noted that although Plaintiff sometimes had to ask for clarification about work tasks or needed reminders to

work faster or finish her tasks, Dr. Ransom concluded that Plaintiff's attention and concentration were adequate. He also observed that she was also able to pay attention at the hearing without being distracted. Finally, her work-based learning evaluations showed that she did well with her assigned tasks and was a self-starter. (Tr. 21). He translated this evidence into a finding that the limitation in this area was moderate. Similarly, with respect to adapting or managing oneself, the ALJ noted that Plaintiff needed reminders at both work and at home, but that she said in her self-report that she could attend to personal care. Dr. Ransom noted that Plaintiff could manage money with the use of a calculator, and school reports showed that her adaptive behavior was in the low range and that Plaintiff had made a good adjustment from high school to transition. (Tr. 22).

Beginning with the issue of Plaintiff's limitation in the area of concentration, persistence, and pace, Plaintiff argues that the ALJ's reliance on Dr. Ransom's report and her ability to participate in the hearing, combined with certain comments on her work evaluation, was unreasonable. She points to other evidence of more significant deficits in this area, including the fact that in 2014 it was noted that her attention span could be as short as five minutes; that on the same work evaluation relied on by the ALJ, it was noted that she became easily distracted and needed constant redirection; that the 2017-18 evaluation showed that she needed encouragement to stay on task and was lacking in speed and pace; and that she had been diagnosed with ADHD. As to the issue of adapting and managing herself, Plaintiff argues that the 2017 school psychologist's report shows that she fell within the low range of overall adaptive functioning, that an earlier report said that she was significantly below average in this area, and that other evidence indicated that she had problems with money skills, using public transportation, and remembering to take her medications.

It is apparent that Plaintiff and the ALJ drew different conclusions about the severity of Plaintiff's impairments in these two areas from the same evidence of record. Ordinarily, that is not a cause for reversal. As the Court of Appeals said in *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998), "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." Of course, the evidence supporting the ALJ's resolution of any conflicts must be substantial, but when a reasonable person could decide the question either way, the Court is not entitled to second-guess the ALJ. *See McGinley v. Comm'r of Soc. Sec.*, 2019 WL 2089832, at *5 (W.D.N.Y. May 13, 2019), *citing Vargas v. Astrue*, 2011 WL 2946371, *15 (S.D.N.Y. July 20, 2011).

Here, there is enough credible evidence in the record from which the ALJ could reasonably have determined that Plaintiff's limitations in these two areas of impairment are no more than moderate. In particular, the latest work evaluation showed that Plaintiff's skills had continuously improved over the course of the year. According to one evaluation, she scored only 37 out of a possible 80 points when rated in twenty different areas during the first quarter of the year, but by the fourth quarter, she achieved a score of 58 out of 80, meeting expectations in all but a few areas. Even in the areas where she was deficient - attendance skills, communication skills, problem-solving skills, and conflict resolution skills - she was given a score of 2.5, which is in between "meets expectations" and "needs improvement." She met expectations in terms of the time she devoted to tasks, her response to supervision, her health and safety, and her self-

regulation. (Tr. 341). Although she was described as benefitting from encouragement to keep on working, there is nothing in the evaluation conclusively showing that she had a marked impairment in staying on task or concentrating on her work. She also was seen as "doing very well with all assigned tasks" and "completing all assigned work." (Tr. 344). There is also little evidence that she was seriously deficient in the areas of self-care.

It is important to note that the ALJ did not find that Plaintiff had either no degree or only a mild degree of impairment in these areas. He concluded that she had a moderate impairment in both. The applicable language from the Listing of Impairments is this: "Moderate limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." A reasonable person could have concluded that Plaintiff had a fair ability to maintain concentration, persistence, and pace, and to manage herself. That being so, the Court finds no merit in Plaintiff's first claim of error.

### B. The School Psychologist's Report

Plaintiff's second claim of error focuses on the report from the school psychologist, Ms. LaPointe. She asserts that the ALJ erred when he gave more weight to the opinion of Dr. Bruno, a non-examining source, that to the opinion of Ms. LaPointe. She also criticizes the reasoning he used for giving substantial weight to Dr. Bruno's opinion.

Ms. LaPointe assessed Plaintiff on January 2 and 3, 2017. As noted above, she administered an intelligence test on which Plaintiff achieved a score of 67, with her "true" score falling between 64 and 72. She also evaluated Plaintiff's everyday life skills, noting that her overall level of adaptive behavior in the school setting fell in the 8th percentile, while it was in the 6th percentile in the home setting. She was below average in her ability to protect her physical well-being and care for her personal hygiene and in the low range in her ability to function in the community. Ms. LaPointe summarized her findings by stating that Plaintiff had made a "nice adjustment from high school to transition" (her work program) but was particularly deficient in the area of processing speed, which could cause her problems in the academic and social settings. Ms. LaPointe confirmed that Plaintiff still met the criteria for students with an intellectual disability and that she would be a good candidate for supported employment. She believed that additional assessments were needed to determine what employment support and training Plaintiff would need, however. (Tr. 517-26).

The ALJ did not specifically assign weight to this report, although he accurately summarized it in his decision. (Tr. 24-25). Had the report actually contained specific functional limitations which differed from those expressed in other expert evaluations, that failure may have created an issue for the Court to review. However, Ms. LaPointe was not evaluating Plaintiff's work-related functional capacity and she did not express any opinions about Plaintiff's ability to do various functions well enough to maintain competitive employment. The only limitation which Plaintiff highlights in her memorandum (Doc. 9, at 24) is a suggested strategy for assisting Plaintiff with learning (including vocational learning), which consists of "[r]epitition, use of visuals, hands-on experiences and real life opportunities" and presentation of new concepts in smaller "chunks" and at a slower pace. (Tr. 526). Ms. LaPointe did not say that these

approaches would need to be used on a continual basis in a work setting. Because there is no real conflict between this report and the ALJ's residual functional capacity finding, the Court sees no error in the ALJ's failure to assign it particular weight. The remainder of this second claim, questioning the ALJ's attributing significant weight to Dr. Bruno's opinion even though he drew certain conclusions from Dr. Ransom's report, to which the ALJ gave little weight, similarly lacks merit and provides no basis for a remand.

### C.  The Residual Functional Capacity Finding

As her third claim of error, Plaintiff claims that the ALJ made multiple errors in finding that she had the ability to perform work with certain limitations. She asserts that he ignored the fact that she has always been in either a structured school or work setting, the latter of which equates to supported employment with the use of a job coach. She notes that were she to continue to require such supports, she could not be competitively employed. Plaintiff also cites to the 2017-18 work evaluation as evidence that her attendance was problematic as was her ability to stay on task and her need for constant feedback. The Commissioner responds that the ALJ was presented with conflicting opinions on the issue of Plaintiff's ability to perform work-related functions and reasonably chose between them.

The record does not bear out Plaintiff's assertions. The ALJ was clearly aware of the structured nature of Plaintiff's school and work experiences. As noted, he accurately and thoroughly summarized the report of Ms. LaPointe, recited correctly that Plaintiff was in special education classes at school, reviewed the teacher evaluations, described the terms of her IEP, and went into great detail concerning the work-based learning evaluations from 2016-2017 and 2017-2018. He was entitled to consider all of this evidence as it related to Plaintiff's ability to perform basic work functions and to determine the extent to which it either agreed or conflicted with the expert reports from Drs. Ransom and Bruno. Had he failed to mention any of this evidence, an argument could be made that he failed to appreciate its significance, but that is not what happened here. Nothing in the various items of evidence cited by Plaintiff indicated conclusively that she could not function outside of a supported or structured work setting, and a reasonable person, looking at the record in its entirety, could have reached the same conclusion as the ALJ did concerning her residual functional capacity. Consequently, there is no merit in this final claim of error. That being so, the Court must, applying the appropriate legal standard, affirm the Commissioner's decision.

### V.  CONCLUSION AND ORDER

For the reasons set forth in this Opinion and Order, the Court **DENIES** Plaintiff's motion for judgment on the pleadings (Doc. 9) **GRANTS** the Commissioner's motion (Doc. 13), and directs the Clerk to enter judgment in favor of the defendant.

                                        **/s/ Terence P. Kemp**
                                        **United States Magistrate Judge**